UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                           Case No. 17-cr-20077
                                               Hon. Matthew F. Leitman

v.

MICHAEL JOSEPH BANDROW,

      Defendant.

_____/

## <u>ORDER GRANTING DEFENDANT'S MOTION<br>FOR COMPASSIONATE RELEASE (ECF No. 45)</u>

Defendant Michael Joseph Bandrow is a federal prisoner incarcerated at FCI Elkton. Elkton has been and continues to be ravaged by the COVID-19 pandemic. And Bandrow has two medical conditions, asthma and epilepsy, that render him especially susceptible to serious consequences or death if he contracts COVID-19. Moreover, Bandrow has developed hematuria – the presence of substantial blood in his urine – since he has been incarcerated at FCI Elkton. Elkton's medical staff has determined that Bandrow's hematuria is a "serious" or "critical" illness, but Bandrow has not yet received treatment for the condition because Elkton, understandably, is devoting its medical efforts toward counteracting the COVID-19 outbreak at the facility. Bandrow now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). (*See* Mot. for Compassionate Release, ECF No. 45.)

For the reasons explained below, Bandrow's motion is **GRANTED**.  As described below, Bandrow shall immediately be released from custody at FCI Elkton to begin his term of supervised release, and the Court adds one year of home confinement as a condition of his supervised release.

# I

# A

On January 24, 2017, Bandrow was charged with distributing, receiving, and possessing child pornography. (*See* Crim. Compl., ECF No. 1, PageID.9.)  Bandrow was arraigned the next day, on January 25, 2017, and at that time the Court released Bandrow on bond. (*See* Order Setting Conditions of Release, ECF No. 7; Appearance Bond, ECF No. 8.)  Bandrow remained on bond for nearly two years, and during that time he fully complied with all of his conditions of release. (*See* Mot. for Compassionate Release, ECF No. 45, PageID.227.)

On April 10, 2018, pursuant to a Rule 11 Plea Agreement, Bandrow pleaded guilty to one count: distribution of child pornography in violation of 18 U.S.C. § 2252A(a)(2). (*See* Rule 11 Plea Agreement, ECF No. 29, PageID.69.)  Bandrow's sentence carried a required minimum sentence of 60 months imprisonment. (*See id.*, PageID.72.)  The Court determined that his range under the Sentencing Guidelines was 210 to 240 months imprisonment. (*See* Sentencing Hr'g Tr. at 10:1–6, ECF No. 43, PageID.196.)

Following Bandrow's guilty plea and before his sentencing, Bandrow was evaluated by Dr. William Nixon, a well-respected psychologist. (*See* Nixon Report, ECF No. 46, PageID.248–258.) Dr. Nixon completed several hours of neuropsychological testing and psychological evaluation of Bandrow. (*See id.*, PageID.248.) Nixon concluded that Bandrow "is a young man who suffers from a very serious and chronic primary mental illness, Bipolar I Disorder." (*Id.*, PageID.257.) According to Nixon, Bandrow's Bipolar Disorder "has tragically gone ignored, misdiagnosed [as ADHD], or untreated since it first made its appearance during his elementary school years and continued relatively unchecked through his young adulthood up to the time of his arrest." (*Id.*) Nixon also concluded that Bandrow "does not carry a diagnosis of Pedophilic Disorder" and that "with proper intensive individual psychotherapy, sex offender education and group therapy, correct medication support, and closely supervised probation, it is unlikely he will be a danger of acting-out on minors." (*Id.*, PageID.258.) In Nixon's opinion, Bandrow had a "good" chance of "living a mentally healthy and productive life as an adult" if he received "comprehensive psychological and psychiatric treatment." (*Id.*)

On October 11, 2018, at Bandrow's sentencing, the Government recommended that the Court impose a sentence of 96 months in custody – a substantial downward variance from the bottom of the Guidelines range. (*See*

10/11/18 Sentencing Hr'g Tr. at 18:6–15, ECF No. 43, PageID.204.)  United States District Judge Marianne Battani determined that an even greater downward variance was appropriate.  She sentenced Bandrow to serve 60 months in custody – the statutory mandatory minimum. (*See id.*, PageID.210–211; Judgment, ECF No. 36, PageID.171.)  Judge Battani also sentenced Bandrow to serve a term of 60 months of supervised release after his release from imprisonment. (*See* Judgment, ECF No. 36, PageID.172.)

Bandrow reported to FCI Elkton to begin serving his term on January 3, 2019. (*See* Order Granting Extension of Surrender Date, ECF No. 38.)  Bandrow's current release date – without factoring in good-time credit – is April 5, 2023. (*See* Mot. for Compassionate Release, ECF No. 45, PageID.227.)   With good-time credit, Bandrow estimates that his release date would be in March 2022. (*See id.*)

## B

After Dr. Nixon clarified Bandrow's proper diagnosis, Bandrow was able to receive the proper medication and counseling he needed to address his underlying mental condition. (*See* BOP Health Assessment, ECF No. 51-1, PageID.387–388, 471; outlining Bandrow's counseling history and his prescription for Venlafaxine, an antidepressant used to treat his Bipolar I Disorder.)  While out on bond, Bandrow says he "proactively addressed the issues underlying his conviction in this case as well as his own childhood abuse issues (both physical and sexual)." (Mot. for

Compassionate Release, ECF No. 45, PageID.239.)   He also "enthusiastically participated in both group and individual therapy at Eastwood Clinic, as well as monthly appointments there with a psychiatrist." (*Id.*)  According to Bandrow, once his medication was changed to address his Bipolar I Disorder, his "ability to progress in counseling was enhanced, as his thinking has become clearer and he simply felt better as a person." (*Id.*, PageID.240.)   Further, "[h]e understands that proper medication and counseling will be critical to keeping him on the right path upon release." (*Id.*)

Bandrow has maintained a positive record while incarcerated.  He has not received any tickets or violated prison rules since he entered FCI Elkton. (*See id.*, PageID.238.)  He "has held a steady job in food services at Elkton." (*Id.*)  And he has "completed at least one class (Geometry)." (*Id.*)

## C

At the time Bandrow reported to FCI Elkton, he suffered from epilepsy and asthma. (*See* BOP Medical Records, ECF No. 54, PageID.439.)  He has prescriptions for an Albuterol inhaler and a steroid inhaler to treat his asthma. (*See* Mot. for Compassionate Release, ECF No. 45, PageID.231.)  And he has been hospitalized several times in the past with epileptic seizures. (*See id.*)

Bandrow's asthma places him at a heightened risk of severe illness or death from COVID-19.  According to the CDC, "[h]aving moderate-to-severe asthma may

increase your risk for severe illness from COVID-19." *Coronavirus Disease 2019 (COVID-19): People of Any Age with Underlying Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited July 20, 2020).  Indeed, the CDC instructs medical providers treating suspected COVID-19 patients to inquire as to whether the patient suffers from asthma. *See Coronavirus Disease 2019 (COVID-19): Phone Advice Line Tool for possible COVID-19 patients*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/hcp/phone-guide/index.html (last visited July 20, 2020).

Bandrow's epilepsy also likely places him at a heightened risk of serious illness or death from COVID-19.  The CDC lists epilepsy as a "high risk condition" for COVID-19 because it is a "[n]eurological condition[] that weaken[s] [a person's] ability to cough." *Coronavirus Disease 2019 (COVID-19): Phone Advice Line Tool for Possible COVID-19 Patients*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/hcp/phone-guide/index.html (last visited July 20, 2020).  Moreover, Bandrow cites two recent studies suggesting that epilepsy may be a serious risk factor for COVID-19. (*See* Mot. for Compassionate Release, ECF No. 45, PageID.233; citing Naoto Kuroda, *Epilepsy and COVID-19: Associations and Important Considerations*, Epilepsy & Behavior (Apr. 13, 2020), https://www.epilepsybehavior.com/article/S1525-5050(20)30301-2/pdf;

6

*Coronavirus (COVID-19) and Epilepsy*, Epilepsy Action (July 13, 2020), https://www.epilepsybehavior.com/article/S1525-5050(20)30301-2/pdf.)

Due to Bandrow's medical conditions, FCI Elkton designated Bandrow as a medically vulnerable prisoner and added him to a list of Elkton prisoners who are at risk of serious illness or death from COVID-19.[1] (*See id.*, PageID.230.)

**D**

Bandrow has also developed hematuria – the presence of blood in his urine – since he entered FCI Elkton. (*See* BOP Medical Records, ECF No. 54, PageID.439.) Hematuria can be a symptom of a kidney impairment. *See, e.g.*, *What Is Hematuria?*, Urology Care Foundation, https://www.urologyhealth.org/urologic-conditions/hematuria (last visited July 20, 2020); Paula F. Orlandi *et al.*, *Hematuria as a Risk Factor for Progression of Chronic Kidney Disease and Death*, BMC Nephrology (June 26, 2018), https://bmcnephrol.biomedcentral.com/articles/10.1186/s12882-018-0951-0. Hematuria is a serious condition because it "may play a mechanistic role in renal [kidney] disease progression." Orlandi *et al.*, *Hematuria as a Risk Factor*, at 2.

Bandrow first reported the blood in his urine to Elkton staff on January 7, 2020. (*See* BOP Medical Records, ECF No. 54, PageID.452.)  On January 21, 2020,

---

[1] FCI Elkton was ordered to create this list of medically vulnerable prisoners as part of ongoing litigation regarding the COVID-19 outbreak at the facility. *See Wilson v. Williams*, No. 20-cv-00794, 2020 WL 2308441, at *1 (N.D. Ohio May 8, 2020).

Bandrow's health services provider noted that Bandrow continued to test positive for hematuria and that he "needs a CT urogram and Urology consult." (*Id.*, PageID.450.)  Bandrow received a urinalysis on April 6, 2020, which indicated that he continued to have blood in his urine. (*See id.*, PageID.446.)  On May 30, 2020, although Bandrow had been "approved for [a] CT urogram and [a] urology consult," he was "placed on medical hold." (Updated BOP Medical Records, ECF No. 55-1, PageID.466.)  Bandrow's medical records indicate that the medical hold was due to the COVID-19 outbreak at FCI Elkton. (*See id.*, PageID.462.)  Elkton medical staff explained to Bandrow that the test and consultation "will be scheduled when we resume normal operations." (*Id.*, PageID.466.)

As of June 4, 2020, Bandrow's CT urogram and urology consultation requests were still pending. (*See* BOP Medical Records, ECF No.54, PageID.440.)  This delay led the BOP to issue a "serious illness/critical illness" alert for Bandrow. (*See id.*)  Despite the alert, Bandrow still has not received the necessary medical procedures to address his hematuria.  On July 10, 2020, Bandrow reported to Elkton medical services that "I just urinated bright red blood. . . .  I've had nothing for 1 1/2 months and 2 days ago it started again." (Updated BOP Medical Records, ECF No. 55-1, PageID.457.)  Bandrow's medical provider reported that Bandrow was still "awaiting [a] urology work-up." (*Id.*, PageID.458.)  On July 13, 2020, Bandrow's counsel informed the Court by email that Bandrow's doctor "told him he still needs

8

the emergency medical procedures recommended back in January of 2020 and could not be given any medication other than ibuprofen until he received those procedures."

Bandrow's hematuria may further increase the risk he faces from COVID-19 because the hematuria may be a symptom of a serious kidney issue. Bandrow cites to one study that suggests that impaired kidneys may create a greater risk of death in COVID-19 patients. (*See* Mot. for Compassionate Release, ECF No. 45, PageID.9; citing Yichun Chang *et al.*, *Kidney Impairment Is Associated with In-Hospital Death of COVID-19 Patients*, medRxiv, https://www.medrxiv.org/content/10.1101/2020.02.18.20023242v1 (Feb. 20, 2020).) And Bandrow notes that, in a recent study of people hospitalized with COVID-19, "44% of the patients had hematuria either upon admission or developed the illness while hospitalized with COVID-19." (*Id.*, PageID.9–10; citing Zhen Li *et al.*, *Caution on Kidney Dysfunctions of COVID-19 Patients*, medRxiv, https://www.medrxiv.org/content/10.1101/2020.02.08.20021212v2 (Mar. 27, 2020).) Further, Bandrow cites a study that concludes that impaired kidney function can lead to severe complications due to COVID-19. (*See id.*, PageID.10; citing Saraladevi Naicker *et al.*, *The Novel Coronavirus 2019 Epidemic and Kidneys*, 97 Kidney Int'l 824 (2020), https://www.kidney-international.org/article/S0085-2538(20)30251-9/pdf.)

**E**

Bandrow petitioned the warden of FCI Elkton for compassionate release on May 8, 2020. (*See* Pet. for Compassionate Release, ECF No. 45-4, PageID.246.)  His request was denied on May 22, 2020. (*See* Denial Letter, ECF No. 45-4, PageID.247.)

**F**

On May 23, 2020, one day after he was denied compassionate release, Bandrow tested positive for COVID-19.[2] (*See* Positive COVID-19 Report, ECF No. 54, PageID.445.)  He has not been retested for COVID-19 or given an antibody test since. (*See* Reply, ECF No. 53, PageID.428.)

**G**

Bandrow now moves for compassionate release. (*See* Mot. for Compassionate Release, ECF No. 45.)  Bandrow argues that his medical conditions, in combination with the severe outbreak of COVID-19 at FCI Elkton, are an extraordinary and compelling reason that warrants his release. (*See id.*, PageID.235–236.)   The

---

[2] Bandrow was first tested for COVID-19 on May 11, 2020. (*See* Inconclusive COVID-19 Test, ECF No. 54, PageID.444.)   That test was returned as "Inconclusive" on May 13, 2020. (*See id.*)  Bandrow was tested a second time on May 18, 2020. (*See* Positive COVID-19 Test, ECF No. 54, PageID.445.)  This test, in which Bandrow tested positive for COVID-19, was reported on May 23, 2020. (*See id.*)

Government opposes Bandrow's motion. (*See* Resp., ECF No. 48.)  The Court held

an on-the-record video hearing on Bandrow's motion on July 6, 2020.

## II

Section 3582(c)(1)(A) describes when a court may grant a prisoner

compassionate release:

> [T]he court . . . may reduce the term of imprisonment (and
> may impose a term of probation or supervised release with
> or without conditions that does not exceed the unserved
> portion of the original term of imprisonment), after
> considering the factors set forth in section 3553(a) to the
> extent that they are applicable, if it finds that
> . . . extraordinary and compelling reasons warrant such a
> reduction . . . and that such a reduction is consistent with
> applicable policy statements issued by the Sentencing
> Commission.

§ 3582(c)(1)(A).

The "applicable policy statements" mentioned in the statute are found in

U.S.S.G. § 1B1.13.  The comment to that section identifies the reasons for release

that may rise to the level of "extraordinary and compelling":

> 1.   <u>Extraordinary and Compelling Reasons</u>.—
> Provided the defendant meets the requirements of
> subdivision (2), extraordinary and compelling
> reasons exist under any of the circumstances set
> forth below:
>
>> (A)   <u>Medical Condition of the Defendant</u>.—
>>
>>> (i)   The defendant is suffering from a
>>> terminal illness (<u>i.e.</u>, a serious and
>>> advanced illness with an end of life

trajectory). A specific prognosis of life expectancy (<u>i.e.</u>, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii)    The defendant is—

    (I)    suffering from a serious physical or medical condition,

    (II)    suffering from a serious functional or cognitive impairment, or

    (III)    experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)    <u>Age of the Defendant</u>.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)    <u>Family Circumstances</u>.

    (i)    The death or incapacitation of the caregiver of the defendant's minor child or minor children.

    (ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)    <u>Other Reasons</u>.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

One district court has offered the following helpful explanation concerning how to apply the compassionate release statute in conjunction with the Sentencing Commission's guidance:

> [P]ursuant to the statutory directive in 18 U.S.C. § 3582(c)(1)(A) and in conjunction with the Sentencing Commission guidance provided in U.S.S.G. § 1B1.13, the Court must consider three issues in evaluating [a federal prisoner's] Compassionate Release application: (i) whether extraordinary and compelling reasons warrant a sentence reduction consistent with the Sentencing Commission's policy statement, (ii) whether [the prisoner] is "a danger to the safety of any other person or to the community," and (iii) whether the section 3553(a) factors "to the extent they are applicable," weigh in favor of a sentence reduction. *United States v. Bellamy*, 2019 WL 3340699, at *2 (D. Minn. July 25, 2019); [*United States v.*] *York*, 2019 3241166, at *5 [E.D. Tenn. July 18, 2019]; *United States v. Beck*, 2019 WL 2716505, at *7 (D.N.C. June 28, 2019); *United States v.*

*Johns*, 2019 WL 2646663, at *3-4 (D. Ariz. June 27, 2019); [*United States v.*] *McGraw*, 2019 WL 2059488, at *3 [S.D. Ind. May 9, 2019].

*United States v. Wong Chi Fai*, No. 93-cr-1340, 2019 WL 3428504, at *2 (E.D.N.Y. July 30, 2019).

## III

## A

The Court finds that there are extraordinary and compelling reasons that support Bandrow's compassionate release. In particular, the combination of several factors – the dangerous COVID-19 outbreak at FCI Elkton, Bandrow's increased susceptibility to severe complications from COVID-19, and Elkton's inability to treat his hematuria – warrants Bandrow's release.

First, as this Court has previously recognized, Elkton has been hit particularly hard by the COVID-19 pandemic. *See United States v. Goins*, No. 11-cr-20376, 2020 WL 3064452 (E.D. Mich. June 9, 2020). And the situation at Elkton remains severe – as of July 20, 2020, there are 318 active cases of COVID-19 among FCI Elkton prisoners, 3 active cases among staff, and at least 9 prisoners have passed away due to COVID-19. *See COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus; *see also United States v. Brant*, No. 18-cr-20155, 2020 WL 2850034, at *2 (E.D. Mich. June 2, 2020) ("The situation at FCI Elkton appears dire. . . . Currently, FCI Elkton

has the second highest mortality rate in the BOP, behind only Fort Worth FMC . . . .").

Second, the outbreak at Elkton is particularly concerning due to Bandrow's heightened susceptibility to severe complications from the virus.  As described in detail above, Bandrow has persistent medical conditions, including asthma, epilepsy, and hematuria, that place him at increased risk of dire consequences from COVID-19.  The Government acknowledges that Bandrow's conditions normally enhance the risk from the virus. (*See* Resp., ECF No. 48, PageID.313.)  But the Government argues that "Bandrow's concerns are largely mitigated by the fact that Bandrow tested positive for Covid-19 over a month ago, [and] his medical records do not reflect that he suffered any serious complications." (Resp., ECF No. 48, PageID.313–314.)  The Government suggests that given Bandrow's history, either he is not at risk for becoming reinfected (because he will have built up immunity) or, if he does become reinfected, the complications will again be non-severe.  The Government's argument is a serious one.  However, as Bandrow notes, there is conflicting evidence whether – to the extent that Bandrow actually had COVID-19 in May 2020[3] – he is immune from contracting the virus again. (*See* Reply, ECF No.

---

[3] Bandrow's COVID-19 test was a PT-PCR test. (*See* Positive COVID-19 Report, ECF No. 54, PageID.445.)  As Bandrow notes, "the CDC has admitted that both false positives and false negatives are not uncommon with polymerase (PT-PCR) tests." (Reply, ECF No. 53, PageID.428; citing Umair Irfan, *Why Even a Super-Accurate COVID-19 Test Can Fail*, Vox (May 27, 2020),

53, PageID.430.)  According to the CDC, "[t]here is no firm evidence yet that the antibodies that develop in response to infection are protective." *Clinical Questions About COVID-19: Questions and Answers*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html (last visited July 20, 2020) (located under the "Are clinically recovered persons infectious to others if they test persistently or recurrently positive for SARS-CoV-2 RNA?" dropdown tab).  And recent news reports suggest that a person who tested positive for COVID-19 and recovered may still be able to become reinfected with the virus. *See* Erika Edwards & Denise Chow, *As Coronavirus Cases Soar, Doctors and Patients Wonder: Is it Possible to Get Reinfected?*, NBC News (July 14, 2020), https://www.nbcnews.com/health/health-news/i-cannot-get-again-it-possible-get-reinfected-coronavirus-n1233667.  Accordingly, there remains a serious question whether he remains at risk of becoming reinfected with COVID-19 and suffering significant health consequences a result.

Third, Elkton's inability to provide care for Bandrow's hematuria further weighs in favor of compassionate release.  Despite knowing about Bandrow's hematuria since January 2020, and being alerted that his condition was a "serious

---

https://www.vox.com/2020/5/1/21240123/coronavirus-quest-diagnostics-antibody-test-covid.)  The fact that Bandrow was not retested for COVID-19 or given an antibody test makes it difficult to conclude whether Bandrow did in fact have COVID-19 in May 2020.

illness/critical illness" on June 4, 2020, FCI Elkton has been unable to provide Bandrow with the CT urogram and urology consultation he needs to address this issue. (*See* BOP Medical Records, ECF No. 54, PageID.441.)  FCI Elkton's delay is understandable as the facility works to counter its severe COVID-19 outbreak.  But Elkton's inability to provide Bandrow with the basic medical care he requires to address his potentially serious kidney issue – an issue that may increase the risk he faces from COVID-19 – is another factor that supports Bandrow's release.

In sum, several factors – the COVID-19 outbreak at FCI Elkton, Bandrow's vulnerability to the virus, his risk of reinfection, and Elkton's inability to care for his hematuria – taken together, amount to extraordinary and compelling circumstances that support Bandrow's compassionate release.[4]

## B

For the reasons explained below (in the context of the Court's discussion of the Section 3553(a) factors), the Court concludes that releasing Bandrow would not pose a danger to the safety of the community or any of its members.

---

[4] Other judges of this court have declined to find extraordinary and compelling circumstances in cases involving medically vulnerable prisoners who have tested positive for COVID-19 and recovered. *See, e.g.*, *United States v. Buford*, NO. 05-80955, 2020 WL 4040705, at *5–6 (E.D. Mich. July 17, 2020) (citing *United States v. Bland*, No. 18-20555 (E.D. Mich. May 28, 2020)).  The Court need not confront the issue of whether Bandrow's risk of reinfection following his apparent recovery, standing alone, is an extraordinary and compelling reason because Bandrow's case involves an additional and unique factor – his hematuria, which Elkton has been unable to treat for more than six months.

**C**

The Court finds that releasing Bandrow would be consistent with the factors listed in 18 U.S.C. § 3553(a).

The nature and circumstances of Bandrow's offense are undoubtedly serious. *See* § 3553(a)(1).  As the Government noted, Bandrow's offense was particularly harmful because it "help[ed] to create a market for child pornography." (Reply, ECF No. 48, PageID.330.)   Thus, this one factor may weigh against granting compassionate release.  But the remaining Section 3553(a) factors weigh in favor of compassionate release.

Bandrow's personal history and characteristics support release.  One of Bandrow's most relevant personal characteristics is his vulnerability to COVID-19 due to his medical conditions and incarceration at FCI Elkton, and that vulnerability strongly supports release now.  Moreover, his recent history suggests that he has made great progress in identifying and addressing the mental health challenges that appear to have contributed, at least to some degree, to his offense.  According to Dr. Nixon, Bandrow's offense was driven, in part, by his undiagnosed Bipolar I Disorder and his history of physical and sexual abuse. (*See* Nixon Report, ECF No. 46, PageID.257–258.)   As Dr. Nixon concluded, Bandrow is not a pedophile and is unlikely to reoffend if he continues with the proper therapy and medication to address his mental condition. (*See id.*)  Bandrow's exemplary conduct while out on

bond and his clean disciplinary record while incarcerated further suggest that his medication and therapy have had a positive effect. And Bandrow's efforts to improve himself and be a contributing member to his environment – including taking courses and holding a steady job while incarcerated – also demonstrate the positive effect of his therapy and medication. These personal circumstances and characteristics weigh in favor of release. *See* § 3553(a)(1).

Likewise, the goal of imposing sufficient punishment would be satisfied by releasing Bandrow. *See* § 3553(a)(2)(A). Bandrow, who never spent a day in custody before this offense, has served more than 18 months of his sentence. He has already suffered meaningful and substantial punishment for his crimes. Moreover, Bandrow will suffer additional restrictions on his liberty through the home confinement condition that the Court will impose. Bandrow's time served plus the continued restrictions on his freedom of movement from the home confinement condition imposed by the Court, together, satisfy the goal of imposing sufficient punishment.

In addition, releasing Bandrow's is consistent with the goal of deterrence. It is unlikely that Bandrow will reoffend given his substantial progress in addressing his mental health challenges. Further, he has served a not insubstantial sentence in prison, and that lengthy period of custody is also long enough to achieve deterrence.

Next, releasing Bandrow to home confinement will not subject the public to a serious risk of harm. *See* § 3553(a)(2)(C).  As described above, it is unlikely that Bandrow will reoffend.  And the Court will require Bandrow, as a condition of his supervised release, to continue participating in his psychological counseling and treatment sessions.   Given Bandrow's improvement since he was correctly diagnosed and began receiving proper medication and other treatment for his Bipolar I Disorder, the Court is persuaded that he will not pose a threat to the public upon release.

Furthermore, the most effective way to deliver medical care to Bandrow is outside of FCI Elkton where he can receive needed monitoring and treatment of his asthma, epilepsy, and hematuria without facing an immediate threat of COVID-19. *See* § 3553(a)(2)(D).  In particular, given FCI Elkton's inability to timely provide medical care to Bandrow to address his hematuria, the Court is persuaded that the most effective way to deliver medical care to Bandrow for his kidney issues is outside of FCI Elkton.  Indeed, this factor weighs very heavily in favor of release because – at least for the foreseeable future – the only place that Bandrow can receive effective treatment for his hematuria is outside of FCI Elkton.  Moreover Bandrow should be able to continue with his psychological treatment and medication regime upon his release.

Finally, Bandrow's release will not produce an unwarranted sentencing disparity because it accounts for his unique medical circumstances. *See* § 3553(a)(6).

## IV

Accordingly, for the reasons explained above, **IT IS HEREBY ORDERED** that Bandrow's Motion for Compassionate Release (ECF No. 45) is **GRANTED**.

The custodial portion of Bandrow's sentence is reduced to time served, and Bandrow shall **immediately** be released from custody at FCI Elkton.[5] Upon his release, Bandrow shall travel directly by automobile from FCI Elkton to the residence of his mother and step-father. Bandrow and all others with him in the automobile shall wear face masks during the drive. After Bandrow arrives at his mother's home, he shall remain inside the house for fourteen days. And for the same 14-day period, he shall quarantine within the house – meaning he shall remain in a room that is separate and apart from all other residents of the house to the extent possible. And when, during the 14-day quarantine period, it is unavoidable for him to be in a separate room, he shall wear a face mask.

---

[5] In some other cases in which the Court has granted compassionate release, the Court has ordered that the defendant serve fourteen days in quarantine in his or her correctional facility before release. The Court declines to order quarantine here given the circumstances at FCI Elkton and the Court's concern that quarantine at that facility would subject Bandrow to an unreasonable risk of COVID-19 reinfection. The Court concludes that ordering Bandrow to quarantine at his mother's residence is sufficient to protect the health and safety of Bandrow, his family members, and the community.

Also, upon Bandrow's release from custody, Bandrow shall begin serving the 60 months of supervised release that Judge Battani imposed in Bandrow's Judgment. (*See* Judgment, ECF No. 36, PageID.172.)  The Court adds as a condition of that supervised release that for <u>one year</u> Bandrow shall be subject to home confinement at his mother's residence and shall not leave that residence other than for employment, job training, religious services, medical and/or mental health appointments, treatment programs, appointments with counsel, and/or other activities approved in advance by his supervising probation officer.  (He may not leave the residence at all during the 14-day quarantine period.)

The Court will not order Bandrow to wear a GPS tether at this time due to the COVID-19 pandemic (and the Court's reluctance to subject the Court's probation officers to any risks associated with applying Bandrow's tether), but the Court will hold a telephonic status conference with counsel in sixty days to discuss whether to require Bandrow to wear a tether at that time.  In all other respects, Bandrow's original sentence remains unchanged.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  July 20, 2020

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on July 20, 2020, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9761